## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **CHRISTINE ODOM,** | : | |
| | : | |
| **Plaintiff and** | : | |
| **Counter-Defendant,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 5:23-CV-264 (CAR)** |
| | : | |
| **WILLIAMS COMMUNICATIONS,** | : | |
| **INC.,** | : | |
| | : | |
| **Defendant and** | : | |
| **Counter-Plaintiff.** | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff/Counter-Defendant Christine Odom filed this suit against her former employer, Defendant/Counter-Plaintiff Williams Communications, Inc. ("WCI"), alleging WCI breached her employment contract by not paying her commissions she is owed and unlawfully terminated her based on her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). WCI counterclaimed for breach of contract for violations of their non-compete agreement. WCI moves for summary judgment on Odom's sex discrimination claim, and Odom moves for summary judgment on her breach of contract claim and WCI's breach of contract claim. Having carefully considered the parties' arguments, the record, and applicable law, the Court **GRANTS** WCI's Motion for Summary Judgment [Doc. 12]

1

and **GRANTS in part and DENIES in part** Odom's Partial Motion for Summary Judgment [Doc. 19]. Specifically, the Court grants summary judgment to Odom on her breach of contract claim that WCI failed to pay commissions in accordance with the contract but finds genuine issues of material fact as to the amount she is owed; grants summary judgment to WCI on Odom's sex discrimination claim; and denies summary judgment to Odom on WCI's counterclaim for breach of contract based on Odom's alleged violation of the noncompete agreement.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2] Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3] When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[4]

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[3] *See id.* at 249–52.
[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[6] This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

WCI provides public safety systems for governmental, and some non-governmental, agencies in Georgia, Florida, and North Carolina.[8] WCI hired Odom in September 2012 as a Regional Sales Manager for Georgia[9] and terminated her nine years later on September 15, 2021.[10]

Facts Relating to Commissions

At the time of her termination, Odom was paid $80,000 per year and a 20%

---

[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324–26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[8] WCI's Statement of Undisputed Material Facts [Doc. 12-2 ¶¶ 1, 2]
[9] *Id.* ¶ 8.
[10] EEOC Charge [Doc. 17-6 at 1].

commission on "gross profit of the transaction" on sales she made.[11] "Professional services" were to be subtracted from the "gross profit."[12] "Gross profit" is calculated by subtracting freight/shipping costs and labor costs from the cost of the sale.[13] The labor costs for a given project were predicted at the beginning of the project by the technical team led by the project manager Ken Steere.[14] WCI marked up the labor estimates to account for unforeseen costs, and Steere would let Odom know at the end of a project if the installation/labor costs had changed.[15]

The schedule for payment of commissions was unclear. WCI contends employees received commission payments one to two times a year.[16] Odom contends there was not a schedule for commission payments, but rather that commissions were paid "after they're submitted and after the projects are completed . . . after payment is received by [WCI]."[17] The salesperson did not get paid commission until after the client was billed and WCI received payment from the client.[18] It was the salesperson's responsibility to keep track of their own commissions and submit them to corporate for review and

---

[11] Letter [Doc. 19-2].

[12] *Id.*

[13] The parties interchangeably refer to this number as "gross profit" or "net profit," but agree on the method of calculation. Odom's Reply to Motion for Summary Judgment [Doc. 34 at 3 n.1]; Plaintiff Christine Odom's Deposition 32:2–20; 39:25–40:4; 118:10–12; 192:12–20 [Doc. 17].

[14] Odom Depo. 36:14–37:17.

[15] *Id.* 39:24–40:23.

[16] WCI's 30(b)(6) Deposition 119:19–23 [Doc. 21]; Hilarie Geraldi's Deposition 77:1–12 [Doc. 15]; Philip Taylor's Deposition 17:6-11 [Doc. 14].

[17] Odom Depo. 61:11–62:4.

[18] *Id.* 124:6–9.

approval.[19]

Odom believes WCI has not paid her all the commissions she earned while employed at WCI, and on July 30, 2021, Odom sent a letter via legal counsel to WCI demanding her unpaid commissions.[20]

<u>Facts Relating to Sex Discrimination</u>

Ken Williams, now deceased, was previously WCI President; Bryan Kocher is the current President; and Hilarie Geraldi is the current Vice President.[21] Tyler Carroll has been WCI's Proposal Manager for the past ten years and primarily works in Florida.[22] Odom alleges that Carroll engaged in inappropriate conduct in 2013 and 2018 or 2019.[23]

In 2013, Carroll allegedly "made a 'humping motion' behind" Odom while the two were at a vendor conference in Las Vegas, which Carroll denies.[24] Odom contends she reported this incident to then-President Williams; she then met with Williams, now-President Kocher, and VP Geraldi about the incident.[25] Geraldi does not recall this incident or this meeting, and there is nothing on the record about Kocher's memory of this incident.[26] In 2018 or 2019, Odom observed Carroll "sharing inappropriate pictures

---

[19] *Id.* 62:4–9

[20] Odom's Statement of Undisputed Material Facts [Doc. 19-15 ¶ 14]; 7-30-21 Attorney Letter to WCI [Doc. 15-4 at 1].

[21] Odom's Statement of Additional Undisputed Material Facts [Doc. 31-14 ¶ 6].

[22] WCI's Statement of Undisputed Material Facts [Doc. 12-2 ¶ 7].

[23] *Id.* ¶ 13.

[24] *Id.* ¶ 14.

[25] Odom Depo. 48:18–25.

[26] Geraldi Depo. 90:6–91:7.

of women" with Josh Franklin, a Florida sales representative, and making "demeaning comments towards women" at a sales meeting.[27] Odom contends she reported this behavior to Geraldi during a break, which Geraldi denies.[28] Odom said that after she spoke to Geraldi, the men "were fine the rest of the day."[29] One or two years later, at another corporate meeting, Carroll responded to a question from Odom that she "should know the answer."[30] Odom told Geraldi about Carroll's comment, and "the rest of the day, [Carroll] seemed to be better[.]"[31] Odom also testified that Carroll regularly made crude remarks about women's bodies and was generally "arrogant, egotistical," and "nonresponsive" to her.[32]

Odom alleges former President Williams "grabbed her butt" and tried to kiss her at the WCI Christmas party in December 2018.[33] Odom called Williams after the fact to discuss his actions, and the two met in March of 2019. At the meeting, Williams apologized but also commented that if Odom was "more cooperative, [she] could go further with the company."[34] Odom did not report that statement to anyone.[35]

---

[27] Odom Depo. 56:16–57:24; Doc. 31-14 ¶ 9; Doc. 12-2 ¶ 17.

[28] Geraldi Depo. 93:3–22; 94:18–22; Doc. 31-14 ¶ 9.

[29] Odom Depo. 57:22–25.

[30] *Id.* 58:2–9.

[31] *Id.* 58:9–11.

[32] *Id.* 58:12–59:18.

[33] Doc. 12-2 ¶ 20. It is unclear whether Ken Williams was still President or had retired when this occurred.

[34] Odom Depo. 51:20–53:13.

[35] *Id.* 51:14–19.

In 2017, Odom resigned from WCI[36] but was immediately rehired with a higher salary.[37] Throughout her time at WCI, Odom often complained about a lack of support from the company in the performance of her job.[38] Carroll and Franklin, both Florida salesmen, benefitted from the customer advocate there. Plaintiff, who worked in Georgia, however, did not have a customer advocate. The customer advocate works primarily in Florida and helps support the customer's needs, primarily involving the statewide radio system, acting as "the go-between between the customer and the state of Florida."[39] Florida has a statewide radio system; Georgia does not. Odom and WCI agree that Georgia and Florida are "two completely different marketplaces."[40] The Florida sales representatives also complained about a lack of support, and it sometimes took multiple requests to get support.[41]

After Odom was rehired in 2017, WCI moved a support representative, John Rioux, to Macon, Georgia for a period of 30 months until 2020,[42] and hired Sherri Woodard, who prepared quotes and helped with customer support in Georgia.[43] Kocher

---

[36] It is unclear whether Odom ever stopped working for WCI.

[37] Odom Depo. 44:8–20.

[38] Doc. 31-14 ¶ 29; Taylor Depo. 62:13–21; Ken Steere's Deposition 38:12–14 [Doc. 20]; 30(b)(6) Depo. 18:19–25.

[39] Geraldi Depo. 13:22–14:17; 135:3–9.

[40] Odom's Affidavit 11-8-24 [Doc. 31-1 ¶ 17]; Doc. 12-2 ¶ 26.

[41] Doc. 12-2 ¶ 32; Josh Franklin's Deposition 24:13-22 [Doc. 16].

[42] Odom Aff. ¶ 21; Odom's Response to WCI's Statement of Undisputed Material Facts [Doc. 31-13 ¶ 33].

[43] Odom Depo. 36:1–11; 93:12–17; 96:10–17.

and Geraldi also lent Odom support, although she thought it was insufficient.[44]

Odom attended a number of training events and seminars throughout her nine-year employment with WCI.[45] But in 2021, WCI "excluded [Odom] from the invite" to a training event hosted by L3 Harris, the manufacturer of many products WCI sells.[46] Two of Odom's male co-workers, Carroll and Franklin, attended at WCI's invitation.[47] Odom contends this exclusion negatively impacted her "industry working knowledge and ultimately success with clients."[48]

Also in 2021, Odom's supervisor, Philip Taylor, told Odom not to attend a sales meeting with a potential client.[49] Odom contends Taylor told her he was giving the opportunity to a new male sales representative,[50] which he denies.[51] Taylor contends he did not want Odom involved in this meeting because "she wasn't doing her job [and] wasn't going to see customers."[52] It is undisputed that WCI ultimately failed to secure the contract, and that no new sales representative was hired, male or female.

Odom also contends WCI failed to pay her some commissions she is owed, which

---

[44] *Id.* 69:19–23; 78:1–79–5.

[45] Doc. 31-13 ¶ 36.

[46] It is unclear whether she was actually disallowed from going by WCI. Odom Aff. 11-8-24 ¶ 23; Doc. 31-13 ¶¶ 35, 36.

[47] Odom Aff. 11-8-24 ¶ 23.

[48] *Id.* ¶ 24,

[49] *Id.* ¶ 25; Taylor Depo. 39:17–40:6.

[50] Odom Aff. 11-8-24 ¶ 26.

[51] Taylor Depo. 40:7–41:3.

[52] *Id.* 40:2–6.

WCI disputes. No other commissioned employees, including Carroll and Franklin, have ever had a commission dispute with WCI. Franklin testified that there are sometimes delays in receiving his commission payments, and WCI has sometimes made partial commission payments.[53]

WCI contends it terminated Odom on September 15, 2021, because of ongoing "performance issues," which Odom disputes. Taylor, Odom's supervisor, testified Odom's performance worsened over time. Odom would "disappear for three to four days and not be on [her] computer," then would "come back a couple of days later and [send] a flurry of emails, like probably 30, 40 emails in one day[.]"[54] Odom's "disappearing had been going on for months" before her termination.[55] Taylor discussed his concerns about Odom missing meetings with Odom while she was still employed.[56] Then, the client for Odom's biggest project called Taylor and expressed that he did not want to deal with Odom anymore and that she was not showing up to meetings.[57] Taylor also received complaints about Odom from two other clients.[58]

Around this time there was an incident where Odom used the n-word in front of

---

[53] Franklin Depo. 9:3–17; 10:2–4.

[54] Taylor Depo. 31:17–32:4.

[55] *Id.* 32:13–15; Geraldi Depo. 44:24–45:4; 111:14–17; 116:11–17.

[56] Taylor Depo. 32:16–19.

[57] *Id.* 34:15–20.

[58] *Id.* 34:21–36:7.

Taylor.[59] Taylor asked Odom not to use it again, and she apologized.[60] This occurred around the time when Taylor began noticing a change in her performance—he questioned her "mental stability" and whether she had a substance abuse issue.[61] Geraldi also had concerns about Odom's "sporadic" behavior and questioned whether Odom had a substance abuse issue.[62] Geraldi and Kocher met with Odom in June 2021, three months before her termination, where they expressed their concerns about Odom missing meetings and her changed behavior.[63] Odom's performance did not improve after this meeting.[64] Odom emphasizes that WCI does not have written documentation of its concerns about Odom's performance or erratic behavior.

In August 2021, WCI's prior counsel sent Odom a letter stating that Odom's "change in job performance and workplace conduct" caused customer complaints.[65] WCI had a Progressive Discipline Policy stating that "with respect to most disciplinary problems," WCI may impose first a verbal warning, then a written warning, then a suspension, then termination.[66] The Policy states the preceding steps "will normally be followed."[67]

---

[59] Odom Depo. 74:25–75:6; Taylor Depo. 33:9–34:11.

[60] Taylor Depo. 34:6–7.

[61] *Id.* 33:19-24; 34:10–14; Doc. 12-2 ¶¶ 50–52.

[62] Geraldi Depo. 154:4–21.

[63] *Id.* 45:5–46:23.

[64] *Id.* 46:19–22; 155:3–156:4.

[65] Dinsmore Letter [Doc. 31-11 at 1].

[66] Doc. 31-14 ¶ 13.

[67] *Id.*

Facts Related to Confidentiality and Non-Compete Agreement

When Odom was hired by WCI, she signed a Confidentiality and Non-Compete

Agreement ("Agreement").[68] Paragraph 3 of the Agreement states:

> **I agree that all books, papers, records**, lists, files, forms, reports, accounts,
> **documents** . . . located in Corporation's offices and all databases . . . **and
> data relating in any manner to the Corporation or its business, operations,
> prices, vendors, suppliers or customers**, whether prepared by me or
> anyone else, and whether or not containing a trade secret or confidential
> information, are the **exclusive property of the Corporation** and that **I shall
> immediately return them to Corporation on the date of termination of my
> engagement** or earlier at Corporation's request at anytime.[69]

Paragraph 5 states, in part:

> **I will not directly or indirectly do or attempt to do any of the following** .
> . . during the period of 2 years after the date of termination of my
> engagement . . . . This limitation applies to the following on behalf of the
> Corporation: **solicit**, employ, engage, hire, call on, compete for, sell to,
> **divert, or take away any customer, supplier,** endorser, advertiser or
> **employee**, agent, subagent, **assist or plan for anyone else to do so**; divert
> or aid, assist or plan for others to divert from Corporation any past or
> pending sale or exchange of any goods, product or service; entice, aid or
> cooperate with others in soliciting or enticing any employee, agent,
> subagent of Corporation to leave, modify or terminate its relationship with
> Corporation . . . or solicit customers of Corporation; . . . compete against
> Corporation for customers, supplies, employees, agents . . . . At the time of
> signing this agreement, the Corporation's business is the design, sales and
> support of communications systems and ancillary products and services.[70]

After WCI terminated Odom, she texted a supplier stating, "Just wanted to let

you know that I left Williams today clue [sic] to their lack to respond and support

---

[68] Bryan Kocher Affidavit ¶ 29 [Doc. 30].

[69] Confidentiality and Non-Compete Agreement [Doc. 30-4 ¶ 3].

[70] *Id.* ¶ 5.

customers. If I can ever help, this is my personal cell."[71] According to Kocher's declaration, Odom also told several customers and vendors that WCI was not paying her commissions, told one of WCI's prospective employees that he should not work for WCI, and "wrongfully retained WCI documentation after her termination," which she then produced in connection with this case.[72] It is unclear from the record who Odom spoke to and what documents she retained.

## DISCUSSION

Odom filed suit alleging WCI breached her employment contract by not paying her commissions she is owed and unlawfully terminated her employment because of her sex. WCI counterclaimed alleging Odom breached their restrictive covenant/non-compete agreement by attempting to solicit business and wrongfully retaining WCI's property. Odom now seeks summary judgment on her breach of contract claim and WCI's breach of contract claim, and WCI seeks summary judgment on Odom's sex discrimination claim.

As explained below, the Court grants summary judgment in part to Odom on her breach of contract claim, grants summary judgment to WCI on Odom's sex discrimination claim, and denies summary judgment to Odom on WCI's breach of contract claim.

---

[71] WCI's Statement of Additional Undisputed Material Facts [Doc. 34-2 ¶ 61].
[72] Kocher Aff. ¶¶ 35–38.

## I.    Odom's Breach of Contract Claim

Odom is entitled to summary judgment on her breach of contract claim for unpaid commissions, with the determination of damages to be made by a jury. Viewing the facts in the light most favorable to WCI, it is clear that WCI improperly calculated Odom's total earned commissions and thus paid her substantially less than she is owed. Both parties have submitted competing affidavits and spreadsheets that create an issue of fact as to the amount WCI owes Odom.

"Generally, contract construction is a question of law for the court."[73] "The cardinal rule of contract construction is to ascertain the intention of the parties."[74] "When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent."[75]

The parties' agreement on Odom's compensation ("Commission Agreement") is contained in a letter from Kocher to Odom.[76] The Commission Agreement states, in part:

> Future commissions will be paid at rate [sic] of 20% based on gross profit of the transaction. Professional services are not included in your gross profit calculation. In the event professional services are omitted from a bid or proposal, those costs based on standard rates will be deducted from gross profit before commission is determined.[77]

---

[73] *Unified Gov't of Athens-Clarke Cnty. v. Stiles Apartments, Inc.*, 295 Ga. 829, 832 (2014) (citing O.C.G.A. § 13-2-1).

[74] O.C.G.A. § 13-2-3.

[75] *Stiles Apartments, Inc.*, 295 Ga. at 832 (citing *Lloyd's Syndicate No. 5820 v. AGCO Corp.*, 294 Ga. 805, 812 (2014)).

[76] Doc. 19-2 at 1.

[77] *Id.*

Odom adopted, for the purposes of summary judgment, what she believes to be WCI's agreed upon numbers, and submitted the "Colorful Chart" and her own chart ("Odom's Chart"), arguing WCI owes her $102,244.27.[78] WCI attempts to rebut this evidence with an affidavit from Kocher and the updated "July 2022 Spreadsheet." In Kocher's 30(b)(6) deposition, he testified that in the July 2022 Spreadsheet, "the negative commissions are being applied as a whole, with the other commissions as offsets."[79] Based on that statement and the Court's own evaluation of WCI's updated July 2022 Spreadsheet,[80] it appears WCI subtracts "negative commissions" from Odom's total earned commissions; that is, instead of treating losses on projects as a $0.00 commission, WCI subtracts the amount lost on the project from Odom's total earned commissions.

Here, the terms of the Commission Agreement are unambiguous. WCI agreed to pay Odom commissions "of 20% based on gross profit of the transaction."[81] The plain language of the Commission Agreement shows the parties intended for Odom to be paid 20% of the profit minus "professional services" *per each transaction*. There is no mention of offsetting a loss on one transaction with the earned commission from another transaction, which is what WCI now attempts to do. In a scenario where a transaction breaks even or loses money, the "gross profit" would be $0.00 because there is no profit.

---

[78] Colorful Chart [Doc. 19-10]; Odom's Chart [Doc. 19-11 at 3].

[79] 30(b)(6) Depo. 176:11–16.

[80] July 2022 Spreadsheet [Doc. 30-3].

[81] Doc. 19-2 at 1.

And 20% of $0.00 is $0.00, not a negative number. The Court cannot find any contractual justification for subtracting losses on one project from Odom's total earned commissions, nor does WCI explain why it believes this would be proper under the contract's terms.

But WCI's July 2022 Spreadsheet creates a question of fact as to how much commission Odom is owed, as many of the numbers differ from those on the Colorful Chart and Odom's Chart for the same projects. The Court's calculations, based on the July 2022 Spreadsheet submitted by WCI, show Odom's earned commissions should total $457,006.21, not $317,675.07 as WCI contends. WCI contends it paid Odom a total of $342,812.58 in commissions,[82] meaning Odom is owed $114,193.63 in unpaid commissions using WCI's own numbers.[83] Odom separately contends she is owed at least $102,144.27 based on WCI's Colorful Chart. Regardless of whose numbers the Court uses, the evidence viewed in WCI's favor shows WCI owes Odom unpaid commissions, but the competing spreadsheets and affidavits create a genuine issue of fact as to the amount of Odom's damages. Both parties will have the opportunity to present evidence supporting their claimed numbers at trial. Thus, the Court grants partial summary judgment to Odom on the issue of WCI's breach of contract.

---

[82] WCI's Statement of Additional Undisputed Material Facts [Doc. 28-1 ¶ 34].

[83] Although there appears to be a deficit between the amounts WCI owes and has paid, because WCI aggregates the commissions for Odom's entire employment, it is impossible for the Court to determine if any unpaid amounts fall outside the applicable statute of limitations. And the parties have not established what that statute of limitations is.

## II.    Odom's Sex Discrimination Claim

### a.  Plaintiff's Title VII Discrimination Claim is Limited to Actions Arising 180 Days Before Plaintiff's March 14, 2022 EEOC Charge

Odom is barred from basing her discrimination claim on the alleged incidents involving WCI employees in 2013, 2018, and 2019. Title VII requires that, in "non-deferral" states such as Georgia, an individual must file an EEOC Charge within 180 days of an alleged unlawful employment practice.[84] "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[85] Odom filed her EEOC charge on March 14, 2022.[86] Thus, the only actionable discrete discriminatory acts that can form the basis of her Title VII discrimination claim must fall between September 15, 2021, the date she was fired, and March 14, 2022. But the time-barred acts may be used as background evidence to support her timely claim.[87]

### b.  *Prima Facie* Case

Because Odom seeks to prove her Title VII discrimination claim through circumstantial evidence, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[88] guides the Court's analysis.[89] Under this framework, a plaintiff

---

[84] 42 U.S.C. § 2000-e-5(e); 29 C.F.R. § 1613(a)(1); *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005).

[85] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[86] EEOC Charge [Doc. 17-6 at 1].

[87] *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

[88] 411 U.S. 792 (1973).

[89] *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (Title VII); *Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (ADEA).

must first establish a *prima facie* case by establishing "facts adequate to permit an inference of discrimination."[90]  If the plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[91]  If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[92] Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[93]

Title VII prohibits an employer from discharging or otherwise discriminating against any individual because of such individual's sex.[94] To establish a *prima facie* case of discriminatory discharge under Title VII, Odom must generally show she (1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside her protected class.[95] It is undisputed Odom meets the first and third prongs—she is a member of a protected class, and she suffered an adverse employment action when WCI terminated her on September 15, 2021. WCI disputes that Odom was

---

[90] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[91] *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

[92] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[93] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[94] 42 U.S.C. § 2000e-2(a)(1).

[95] *See Rosado v. Sec'y, Dep't of the Navy*, No. 23-10181, 2025 WL 381001, at *4 (11th Cir. Feb. 4, 2025) (citation omitted).

treated less favorably than similarly situated comparators.[96]

Although Odom suffered an adverse employment action when she was terminated, Odom fails to establish a prima facia case of discrimination because she fails to establish that WCI treated similarly situated employees outside her protected class more favorably. "To satisfy the fourth element of the *McDonnell Douglas* prima facie case, a plaintiff must show that [s]he and h[er] comparators were 'similarly situated in all material respects.'"[97] "Although this is a case-specific inquiry, a similarly situated comparator ordinarily will have: (1) engaged in the same basic conduct or misconduct; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history."[98] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[99] Here, none of Odom's co-workers are sufficiently similar to qualify as valid comparators.

Odom argues Tyler Carroll and Josh Franklin are similarly situated comparators.

---

[96] WCI also argues Odom was unqualified for the job because of her performance issues. Odom's "credentials and experience qualified her for the job, as evidenced by the fact that [WCI] hired her in the first place. . . . Of course, the fact that [Odom] was qualified to perform her job competently does not mean that she actually did so, an issue that is sharply contested by the parties." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Because the issue of Odom's job performance is intertwined with the issue of whether her termination was pretextual, her job performance is evaluated in more detail at the pretext stage. *See Holifield*, 115 F.3d at 1562 n.3; *Alvarez*, 610 F.3d at 1265.

[97] *Blash v. City of Hawkinsville*, 856 F. App'x 259, 264 (11th Cir. 2021) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc)).

[98] *Id.*

[99] *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008).

The Court disagrees. Neither Carroll nor Franklin are valid comparators because they were not similarly situated in all material respects to Odom—neither had the same performance issues as Odom, nor were their jobs sufficiently like Odom's.

Odom's conclusory denials and references to WCI's lack of "documentation" substantiating any performance issues are insufficient to create a genuine issue of material fact as to WCI's belief that Odom had performance issues. Odom had multiple customer complaints and had missed both customer and internal meetings. There is no evidence Carroll or Franklin had any similar issues. Carroll and Franklin both worked in Florida, which Odom agrees is a completely different market than Georgia, where she worked. Odom and Franklin were both sales representatives, but their jobs were different because of the differences between the Georgia and Florida markets. Carroll was the Proposal Manager and had completely different duties than Odom—he handled pricing for large system sales and requests for proposals, which Odom did not.[100] Thus, Odom's *prima facie* case of sex discrimination fails because she cannot establish she was treated less favorably than a similarly situated individual outside her protected class.

### c.  Pretext

Even if Odom could establish a *prima facie* case of discrimination under Title VII, WCI has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff—

---

[100] Tyler Carroll's Deposition 7:15–24 [Doc. 18].

her performance-related issues and client complaints. Thus, to survive summary judgment, Odom must present sufficient evidence to create a genuine issue of material fact that WCI's reasons are merely pretext for unlawful sex discrimination. Odom has failed to meet this burden. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[101]

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."[102] The plaintiff must rebut the employer's proffered reasons "head on" and cannot succeed by "quarreling with the wisdom" of the reasons.[103] A plaintiff cannot show pretext by simply showing that the employer was incorrect in its decision; rather if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief, then the plaintiff's discrimination claim cannot succeed. "An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is

---

[101] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

[102] *Jones v. Gulf Coast Health Care of Del., LLC*, (11th Cir. 2017) (quoting *Combs*, 106 F.3d at 1538).

[103] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

not for a discriminatory [or retaliatory] reason.'"[104] The inquiry into pretext is concerned with the employer's beliefs, not the employee's perceptions of her performance.[105]

The Court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees."[106] "The question to be resolved is not the wisdom or accuracy of [WCI's] conclusion that [Odom's] performance was unsatisfactory, or whether the decision to fire her was 'prudent and fair.'"[107] Instead, "our sole concern is whether unlawful discriminatory animus motivated the decision."[108] This Court does not "sit as a super-personnel department that reexamines an entity's business decisions."[109] "Therefore, even if a plaintiff's evidence supports an [inference] that the proffered reason is 'pretext of *something*,' summary judgment is appropriate if the plaintiff does not produce evidence that the reason was pretext of discrimination."[110]

Odom fails to establish a genuine issue of material fact showing WCI's decision to terminate her was pretext for sex discrimination. There is no evidence from which a reasonable juror could find WCI's reasons for terminating Odom are unworthy of

---

[104] *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1341 (11th Cir. 2023) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc)).

[105] *Holifield*, 115 F.3d at 1565.

[106] *Alvarez*, 610 F.3d at 1266 (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).

[107] *Id.*

[108] *Id.*

[109] *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (quotation omitted).

[110] *McNeal v. Int'l Paper*, No. 21-12672, 2022 WL 5434274, at *4 (11th Cir. Oct. 7, 2022) (quoting *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1337–38 (11th Cir. 2015)).

credence or were motivated by any discriminatory animus based on sex.

In *Alvarez v. Royal Atlantic Developers, Inc.*, the Eleventh Circuit Court of Appeals affirmed summary judgment for an employer on the plaintiff's discrimination claim because there was no genuine issue of material fact that the employer fired the plaintiff for a legitimate non-discriminatory reason.[111] The plaintiff argued that the employer's "complaints about the quality of her work were unfounded," but the Eleventh Circuit emphasized that the pretext inquiry centers on the employer's beliefs, not the employee's. The plaintiff argued "in essence that she did her job as well as she could reasonably be expected, given the mess the company's accounts were already in."[112] The Eleventh Circuit explained that argument "is no different than arguing that [the employer] should have been satisfied with [the employee's] performance, or that it is unfair for her not to have been satisfied."[113] But the question is not whether the proffered reasons for termination are "ill-founded."[114] Rather, the question is whether "unlawful discrimination was the true reason."[115]

Similar to the plaintiff in *Alvarez*, Odom argues that her performance issues have "been made up as a justification for litigation purposes."[116] She insists that she was not

---

[111] 610 F.3d at 1268.

[112] *Id.* at 1266.

[113] *Id.*

[114] *Id.* at 1267.

[115] *Id.* (citation omitted).

[116] Odom's Response to WCI's Motion for Summary Judgment [Doc. 31 at 5].

unresponsive to clients, but she also concedes that clients may have gotten the impression she was unresponsive, placing the blame on WCI's failure to give her adequate support. Odom argues WCI removed the support representative Rioux from Macon in 2020 and became less responsive because of her complaints about Carroll in 2018 or 2019. But the temporal proximity between Odom's complaint about Carroll's actions over one year before WCI relocated Rioux is too attenuated to show sex discrimination. Indeed, Odom admits that the "lack of support is nothing new."[117] In fact, Odom argues she resigned in 2017 because of a lack of support, but WCI re-hired her because she was a "high-performing employee."[118] Odom may be correct that WCI should have supported her more, but the prudence of that business decision is not at issue here. WCI "was free to set unreasonable or even impossible standards, as long as [it] did not apply them in a discriminatory manner."[119]

The fact that "Odom openly complained about not receiving sufficient support"[120] does not demonstrate discriminatory animus because Odom complained frequently both before and after her reports of misconduct. To the extent Odom argues WCI intentionally withheld support from her to sabotage her in front of its clients, such

---

[117] *Id.*

[118] *Id.* Odom contends that she resigned because she lacked adequate support; WCI then sought to entice her back by providing more support; then WCI took away the support in retaliation for her complaint against Carroll over one year earlier.

[119] *Alvarez*, 610 F.3d at 1267.

[120] Doc. 31 at 6.

argument is unpersuasive. With no evidence to support this claim other than conjecture, the Court cannot infer that WCI would sabotage its own profits by upsetting customers in order to concoct an excuse to terminate Odom. Moreover, Odom argues that any issues with her performance were not her fault, but she does not deny her performance issues outright. "[A]n inference [of discrimination], is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact."[121] Odom's argument that she was not given adequate support to do her job because she was a woman is a mere suspicion, and it is insufficient to create a genuine issue of fact over whether discriminatory animus motivated Odom's termination.

Odom's comparisons to the support her male co-workers in Florida received are unconvincing because the market in Florida is indisputably much larger, more profitable, and completely different from her market in Georgia because of the statewide system. Furthermore, the record contains many instances where Odom received support from her colleagues, including Kocher and Geraldi.[122] Odom expounds on the myriad ways her job was "more difficult" than that of her male counterparts.[123] The record reflects that the main reason it was more difficult, however, is that Carroll and Franklin covered the Florida market, and Odom covered the Georgia market.

---

[121] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 n.25 (11th Cir. 2011) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

[122] Odom Depo. 36:2–8, 69:19–23, 71:13–14, 78:1–4, 93:10–22, 96:10–17, 98:9–12, 99:4–16, 103:10–18.

[123] Doc. 31 at 5.

Odom's impression that she lacked support does not discount those facts. WCI's failure to allocate more resources to the Georgia salesperson may indicate a poor business decision, but it does not indicate discriminatory animus.

The record supports WCI's legitimate reason for terminating Odom. WCI contends Odom's performance issues increased in the months preceding her termination in September 2021. Odom argues WCI invented her performance issues as pretext to terminate her, but she fails to carry her burden. Odom argues that WCI has no documentation of her supposed performance issues, but she cites an August 2021 letter from WCI's attorney undercutting this argument. That letter to Odom refers a "change in job performance and workplace conduct" causing customer complaints.[124]

Odom also argues WCI failed to follow its Progressive Discipline Policy ("Policy") which states that "with respect to most disciplinary problems," WCI may provide first a verbal warning, then written, then a suspension, then termination.[125] An employer's failure to follow its own standard policies may be evidence of pretext.[126] But the evidence here does not demonstrate pretext. The Policy makes clear that it does not apply to all disciplinary problems and is not mandatory.[127] The Policy states the steps

---

[124] Dinsmore Letter [Doc. 31-11 at 1].

[125] Doc. 31-14 ¶ 13.

[126] *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006).

[127] *See Tanner v. Stryker Corp. of Mich.*, 104 F.4th 1278, 1290 (11th Cir. 2024) (finding no pretext when attendance policy stated that warnings would "generally" given, and none were given to the plaintiff).

"will normally be followed."[128] Further, there is evidence of partial compliance because Kocher and Geraldi met with Odom months before her termination. Finally, there is no evidence WCI followed this policy for other employees.[129] Odom's attempt to dispute the facts based on a lack of "documentation" is insufficient to create a genuine dispute of fact.[130]

Finally, Odom points to Taylor's stray comment that a new sales opportunity needed to be preserved for a new male representative when he did not let Odom attend a prospective client meeting. Taylor denies saying he was saving the opportunity for a new male representative but further explains that he did not want Odom involved because "she wasn't doing her job [and] wasn't going to see customers."[131] But assuming Taylor made the comment, as the Court must at this stage of the proceedings, it is undisputed that Taylor attended the meeting alone, the new employee was never hired, and this new contract was never secured. This evidence is "too weak to raise a genuine issue of fact."[132]

---

[128] Doc. 31-14 ¶ 13.

[129] *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 829 (11th Cir. 2019) ("[T]o establish pretext based on failure to follow internal procedures, a plaintiff must show that the employer's 'deviation from policy occurred in a discriminatory manner.'") (quoting *Rojas* 285 F.3d at 1344 n.4).

[130] *See* Doc. 31-13 ¶¶ 51–53, 55–59.

[131] Taylor Depo. 40:2–6.

[132] *Alvarez*, 610 F.3d at 1268 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)) (citing *Rojas*, 285 F.3d 1339 at 1342–43).

### d. No Convincing Mosaic

Odom argues that even if her sex discrimination claim fails under the *McDonnell Douglas* framework, her claim survives under a convincing mosaic theory. Odom is correct that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a discrimination claim based on circumstantial evidence.[133] Indeed, it "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[134] The Eleventh Circuit has provided that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"[135] For summary judgment to be improper, the circumstantial evidence, when taken in the light most favorable to Plaintiff, must be "convincing" and must raise a "reasonable inference" the employer acted with discriminatory intent.[136] "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3)

---

[133] *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768, n. 3 (11th Cir. 2005) (Title VII).

[134] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

[135] *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

[136] *Id.*

pretext."[137]

In addition to the arguments the Court has already addressed, Odom relies on her one-time exclusion from the L3 Harris training in 2021 and her dispute with WCI over unpaid commissions. These "bits and pieces" of evidence are insufficient to create a triable issue of fact.[138] Odom attended many trainings during her nine years at WCI and could only identify one she was excluded from in 2021. And although the Court has found that WCI has failed to pay Odom all her commissions, she has shown no connection between WCI's failure to pay proper commissions and her sex. The mere fact that her male colleagues have not disputed the commissions they are owed is insufficient.[139]

The Court acknowledges that the timing of Odom's termination, about one-and-a-half months after retaining legal representation to demand her unpaid commissions, is suspicious. But while this may be "pretext of *something*," it is insufficient to show pretext of sex discrimination because Odom has failed to provide evidence demonstrating a causal connection between Odom's termination and her sex.[140]

For the reasons already discussed, the evidence simply does not raise an inference of discrimination based on sex or refute WCI's legitimate, non-discriminatory

---

[137] *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis*, 934 F.3d at 1185)).

[138] *McCreight v. AuburnBank*, 117 F.4th 1322, 1333 (11th Cir. 2024).

[139] The record reflects that Odom was the only female sales representative at WCI.

[140] *McNeal v. Int'l Paper*, No. 21-12672, 2022 WL 5434374, at *4 (11th Cir. Oct. 7, 2022) (quoting *Flowers*, 803 F.3d at 1338). Moreover, Plaintiff does not bring a retaliation claim.

reasons for terminating Odom's employment sufficient to survive summary judgment. Here, even when construed in the light most favorable to Odom, the record simply does not support a reasonable inference of intentional discrimination based on Odom's sex.

## III.    WCI's Breach of Contract Counterclaim

The Court finds genuine issues of material fact exist as to WCI's counterclaim against Odom for breach of contract for alleged violations of her restrictive covenant/non-compete agreement.

### a.    Choice of Law

District courts apply choice of law rules of the forum state—in this case, Georgia—when there is a choice of law issue in a case, like the one at bar, based on diversity jurisdiction.[141] Where a contract has a choice of law provision that purports to apply the law of another jurisdiction, Georgia courts engage in a two-step analysis to determine if Georgia law should apply. First, the court must determine whether there were significant contacts with Georgia, such that the application of Georgia law would be "neither arbitrary nor constitutionally impermissible."[142] Second, the court must determine whether the law of another jurisdiction would contravene the public policy

---

[141] *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (citation omitted).

[142] *Convergys Corp. v. Kenner*, 276 Ga. 808, 810 (2003); *see also Rayle Tech, Inc. v. Dekalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998).

of Georgia. If so, Georgia law applies.[143]

  **b. Analysis**

  "[R]estrictive covenants that do not comply with the [Georgia Restrictive Covenants Act] ["GRCA"] are contrary to public policy."[144] "So a Georgia court that is asked to apply foreign law to determine whether to enforce a restrictive covenant must first apply the GRCA to determine whether the restrictive covenant complies with it."[145] If the Court finds the restrictive covenants are contrary to Georgia's public policy, the Court may "partially enforce the covenant through blue-penciling—'modify[ing]' the covenant and 'grant[ing] only the relief reasonably necessary' to protect the legitimate business interests and achieve the parties' intent 'to the extent possible.'"[146]

  <u>Solicitation Provision</u>

  The GRCA generally permits non-solicitation agreements. "Any reference to a prohibition against 'soliciting or attempting to solicit business from customers' or similar language shall be adequate for such purpose and narrowly construed to apply only to: (1) such of the employer's customers, including actively sought prospective customers, with whom the employee had material contact; and (2) products or services that are competitive with those provided by the employer's business."[147]

---

[143] *Id.*

[144] *Motorsports of Conyers, LLC v. Burbach*, 317 Ga. 206, 216 (2023).

[145] *Id.*

[146] *Id.* (quoting O.C.G.A. § 13-8-54(b)).

[147] O.C.G.A. § 13-8-53(b).

Odom argues summary judgment is warranted for any breach of Paragraph 5, the non-solicitation provision, because (1) her conduct did not constitute solicitation as a matter of law, and (2) the non-solicitation clause is unenforceable because it is overbroad. Paragraph 5 states, in relevant part:

> **I will not directly or indirectly do or attempt to do any of the following** . . . during the period of 2 years after the date of termination of my engagement . . . . This limitation applies to the following on behalf of the Corporation: **solicit**, . . . **divert, or take away any customer, supplier**, . . . **or** employee, agent, subagent, **assist or plan for anyone else to do so**; divert or aid, assist or plan for others to divert from Corporation any past or pending sale or exchange of any goods, product or service; entice, aid or cooperate with others in soliciting or enticing any employee, agent, subagent of Corporation to leave, modify or terminate its relationship with Corporation . . . or solicit customers of Corporation; . . . compete against Corporation for customers, supplies, employees, agents . . . . At the time of signing this agreement, the Corporation's business is the design, sales and support of communications systems and ancillary products and services.[148]

"Ordinarily, words in a contract are given their usual, common meaning."[149] "And, except when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning.[150] Georgia courts have defined the word "solicit" in multiple ways. The Georgia Court of Appeals has referenced Black's Law

---

[148] Doc. 30-4 ¶ 5.

[149] *Global Payments Direct, Inc. v. Frontline Processing Corp.*, 360 Ga. App. 753, 760 (2021) (citation omitted).

[150] *Id.* (citation omitted).

Dictionary, which defines "solicit" to mean "[a]n attempt or effort to gain business."[151]

"Solicit" may also mean "to entreat, importune . . . to endeavor to obtain by asking or pleading . . . to urge . . ."[152] Georgia courts have found that solicitation requires "some affirmative action" and "[m]erely *accepting* business that [a party] was forbidden otherwise to seek out for a period of time does not in any sense constitute a solicitation of that business."[153]

This is not a case where Odom passively received business from former customers. Although there is no evidence Odom was successful in soliciting or diverting business from WCI, the Agreement explicitly forbids solicitation *attempts*, and there is evidence Odom acted affirmatively by reaching out to suppliers and at least one potential employee. And the evidence, construed in WCI's favor, shows that Odom did not "[m]erely have a conversation" with these third parties but that she informed them of her departure while disparaging WCI.[154] Further, Odom focuses closely on whether or not her actions constituted a solicitation, but the Agreement also forbids attempts to "divert" suppliers, customers, and employees.[155] Regardless of whether the evidence shows Odom was soliciting these suppliers, her communications can be viewed as

---

[151] *Id.* (quoting *Solicit*, BLACK'S LAW DICTIONARY (7th ed. 2004)) (citing *Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2012)).

[152] *Mgmt. Compensation Grp./Se., Inc. v. United Sec. Employee Programs, Inc.*, 194 Ga. App. 99, 102 (1989).

[153] *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1995) (citation omitted).

[154] *See LifeBrite Laboratories, LLC v. Cooksey*, No. 1:15-cv-4309, 2016 WL 7840217, at *8 (N.D. Ga. Dec. 9, 2016).

[155] Doc. 30-4 ¶ 5.

affirmative attempts to divert WCI's suppliers.

Odom argues the non-solicitation clause is unenforceable under Georgia law but relies on superseded law.[156] Moreover, the non-solicitation clause is enforceable under Georgia law. Enacted in 2011, O.C.G.A. § 13-8-53(b) instructs courts to narrowly construe references to a prohibition against solicitation of customers.[157] To the extent the non-solicitation provision is overly broad, the Court is instructed to narrowly construe the language to apply only to: (1) the employer's customers, including actively sought prospective customers, with whom the employee had material contact; and (2) products or services that are competitive with those provided by the employer's business.[158] At this stage, the evidence shows that Odom's communications at issue fall under these parameters because the communications were to existing suppliers and an actively sought employee. The potential overbreadth of the provision does not render it unenforceable under the GRCA.[159] Thus, because the non-solicitation provision does not offend Georgia's public policy, the Court may apply the law of Florida.[160]

---

[156] Before 2011, Georgia law disfavored restrictive covenants. *Lowe Elec. Supply Co. v. Rexel, Inc.*, No. 5:14-CV-335 (CAR), 2014 WL 5585857, at *2 (M. D. Ga. Nov. 3, 2014) (citations omitted). In 2011, the law of restrictive covenants changed, and restrictive covenants are now considered presumptively valid. *Id.*

[157] O.C.G.A. § 13-8-53(b).

[158] *Id.*

[159] Although the Court does not find it necessary to do so here, the GRCA permits courts to "modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive . . . ." O.C.G.A. § 13-8-53(d).

[160] Florida law allows a court to consider only the legitimate business interests of the party seeking to enforce the covenant and requires courts to modify, rather than invalidate, any restrictive covenants that violate Florida law. *See* F.S.A. § 542.335(1)(c). Under Florida law, courts cannot consider the impact of the restraint on the party against whom enforcement is sought. *See* F.S.A. § 542.335(1)(g)(1).

Odom does not contend that Paragraph 5 is unenforceable under Florida law, but rather argues her conduct does not violate the Agreement because it does not constitute "solicitation." As discussed above, the Court disagrees and finds genuine issues of material fact remain as to whether Odom breached the Agreement.

<u>Company Property Provision</u>

The Court finds genuine issues of material fact remain as to whether Odom breached the Agreement by retaining company property. Odom argues she is entitled to summary judgment for any breach of Paragraph 3, the return of property provision, because (1) the only property Odom allegedly retained are documents she has used in connection with this lawsuit, and (2) these documents are not confidential.

Paragraph 3 states, in relevant part:

> **I agree that all books, papers, records**, lists, files, forms, reports, accounts, **documents** . . . located in Corporation's offices and all databases . . . **and data relating in any manner to the Corporation or its business, operations, prices, vendors, suppliers or customers**, whether prepared by me or anyone else, and whether or not containing a trade secret or confidential information, are the **exclusive property of the Corporation** and that **I shall immediately return them to Corporation on the date of termination of my engagement** or earlier at Corporation's request at anytime.[161]

Genuine issues of material fact remain as to whether Odom retained WCI property in violation of Paragraph 3. WCI has produced evidence, in the form of a declaration from its President, Bryan Kocher, that Odom retained WCI documents after

---

[161] Doc. 30-4 ¶ 3.

she was terminated.[162] Odom has not denied that she kept WCI documents, and assuming she does deny it, there is still a genuine issue of material fact. Neither party has identified what specific WCI materials were retained, thus the Court cannot determine the accuracy of Odom's contention that these documents are on the record or that they are publicly available. Moreover, Odom's arguments that the documents are not confidential is immaterial based on the language of the Agreement.

Causation/Damages

Odom's final argument for summary judgment is that WCI cannot show her actions caused WCI any damage. Causation and damages are two necessary elements of a breach of contract action, and WCI has established genuine issues of material fact on both.

Odom argues WCI has failed to show Odom's conduct actually caused it damage, but she does not challenge the enforceability of the liquidated damages provision. The Agreement contains a liquidated damages provision stating that Odom would "pay as liquidated damages to [WCI] the sum of $100.00 per day, for each day or part thereof that [she] continue[s] to break the agreement."[163] Under the terms of the contract, WCI is not required to show actual damages; Odom's breach is sufficient. Because genuine issues of material fact remain as to whether Odom breached Paragraphs 3 and 5 of the

---

[162] Doc. 30 ¶¶ 37, 38.
[163] Doc. 30-4 ¶ 8.

Agreement, WCI's failure to show its damages does not prevent its claim from proceeding to trial. Thus, summary judgment on WCI's counterclaim for breach of contract is denied.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** WCI's Motion for Summary Judgment [Doc. 12] and **GRANTS in part and DENIES in part** Odom's Partial Motion for Summary Judgment [Doc. 19]. Specifically, the Court grants summary judgment to Odom on her breach of contract claim that WCI failed to pay commissions in accordance with the contract but finds genuine issues of material fact as to the amount she is owed; grants summary judgment to WCI on Odom's sex discrimination claim; and denies summary judgment to Odom on WCI's counterclaim for breach of contract based on Odom's alleged violation of the noncompete agreement.

**SO ORDERED**, this 28th day of March, 2025.

S/ C. Ashley Royal_____
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT